J-A01038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JUSTIN HALE | : | |
| | : | |
| Appellee | : | No. 1116 EDA 2023 |

Appeal from the Order Entered April 28, 2023
In the Court of Common Pleas of Northampton County Criminal Division
at No(s):  CP-48-CR-0001116-2020

BEFORE:   LAZARUS, P.J., PANELLA, P.J.E., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 21, 2024**

The Commonwealth appeals the grant of a new trial based on an after-discovered evidence claim that Appellee, Justin Hale, raised in a post-sentence motion.  A jury found Appellee guilty of robbery and related offenses.  The after-discovered evidence was a recantation statement from one of the two alleged victims, who did not appear at trial.  The trial court granted the new trial after an evidentiary hearing during which it heard testimony from the absent-from-trial victim who claimed that the other victim had instructed her what to say during a 9-1-1 call that was played during Appellee's trial.  We affirm.

The victim who appeared for trial, Todd Bartee, identified Appellee as a friend who had previously lived with him for a three-to-four-month span.  N.T.

_____

[*] Retired Senior Judge assigned to the Superior Court.

10/5/22, 37.  Bartee also identified Appellee's alleged co-conspirator, Quentin Wimberly, as another friend who he had met through Appellee and had known for about two or three months.  *Id.* at 39.

On the afternoon of March 29, 2020, Bartee and his girlfriend of about six to seven months, Taisha Diaz (the other victim who did not appear at trial), were at the apartment of their friend, Kayla Ortiz, in the 400 block of Wyandotte Street in Bethlehem.  N.T. 10/5/22, 39-40.  They were there for a meal with Ortiz and Wimberly had joined them.  *Id.* at 41.  After about ten to fifteen minutes, Wimberly left.  *Id.*  Wimberly returned with Appellee and they confronted Bartee and Diaz.  *Id.* at 44-45.  They demanded cash.  *Id.* at 44, 48.  Appellee was wearing a black tracksuit with white stripes down the sides and Wimberly was wearing a colorful Looney Tunes coat that had Bugs Bunny and Daffy Duck on it.  *Id.* at 45.  Appellee was armed with a 9-millimeter handgun and Wimberly had a .38 revolver.  *Id.* at 45-46.  Appellee asked Bartee, "You think I wouldn't find your ass," and put his gun under Bartee's chin.  *Id.* at 46-48.

Appellee took between $3,400 and $3,500 from Bartee's pocket.[1]  N.T. 10/5/22, 50-51.  Appellee and Wimberly both pistol whipped Bartee on the back of his head.  *Id.* at 51-53.  Wimberly took Bartee's credit card and ripped

---

[1] Bartee explained at trial that the money that was taken from him was from an insurance settlement that he received after he "was in an accident," and the Commonwealth moved into the record documents reflecting a settlement of $4,560 that Bartee received on March 2, 2020.  N.T. 10/5/22, 73, 93-100; N.T. 10/7/22, 26.  Bartee noted that Appellee knew about his settlement from their time living together.  N.T. 10/5/22, 73.

a chain off him. *Id.* at 53. Wimberly hit Diaz on her head with his gun a couple of times. *Id.* at 54. He also took her cellular phone. *Id.* at 55. Appellee and Wimberly then left the apartment. *Id.*

Bartee followed Appellee and Wimberly on Wyandotte Street and onto Cherokee Street to the driveway of the home of Appellee's girlfriend, Joanne Batiz. N.T. 10/5/22, 38, 56-58, 63. Appellee fired a gunshot in Bartee's direction from forty to fifty yards. *Id.* at 63-64. Bartee ducked and was not wounded.[2] *Id.* at 64. Bartee fled as Appellee and Wimberly departed in a black Audi being driven by Batiz. *Id.* at 65-66, 70.

Bartee returned to Ortiz's apartment and proceeded to put his remaining items from the apartment in bags and stowed them underneath a nearby car, fearing that Appellee and Wimberly would return. N.T. 10/5/22, 66. While standing with Bartee outside Ortiz's apartment building, Diaz proceeded to call 9-1-1, using Bartee's cellular phone. *Id.* at 67-68. They then decided to walk in the direction of a nearby hospital. *Id.* at 69.

As Bartee and Diaz were walking together, Appellee and Wimberly pulled up to them in the black Audi and started following them.[3] N.T. 10/5/22, 70-

---

[2] The Commonwealth noted in its closing arguments that the time stamp on a surveillance video admitted into evidence showing the ducking moment reflected that it happened at about 4:15 p.m. N.T. 10/7/22, 203-04.

[3] Surveillance video from a liquor distributor in Phillipsburg, New Jersey (about thirty minutes from Bethlehem), showed Wimberly and Appellee, accompanied by a woman, enter the store at 5:41 p.m. and make a purchase in less than ten minutes. N.T. 10/6/22, 193-97, 202.

71. Appellee's girlfriend was no longer in the car. *Id.* at 70. Bartee ran toward the hospital with the Audi pursuing him. *Id.* at 71. A police officer in a marked patrol car at that location then pursued the Audi. *Id.* at 71-72.

Afterwards, Bartee told responding police officers what had happened. N.T. 10/5/22, 72. The officers accompanied him to retrieve his belongings from the car near Ortiz's apartment building and then took him to a police station where he spoke with Detective Blake Kurtz. *Id.* Bartee then described the events of the day to the detective. *Id.* at 73.

At 6:30 p.m., Bethlehem Police Officers Jeremy Rimmer and Jeremy Banks responded to 421 Wyandotte Street in connection with a report of a robbery that occurred. N.T. 10/6/22, 32-33, 76-77. The 9-1-1 call notes available to the officers informed them that: (1) "the caller was shot at and also pistol whipped;" (2) the "robber" was named as Justin Hale "and that he was driving a black Audi;" and (3) "a phone was stolen and some sort of settlement check was stolen in the robbery." *Id.* at 34. Upon arriving to Wyandotte Street, the officers were updated that the caller had begun walking towards St. Luke's Hospital in the area of Mohegan street and "that the robber was following them in a black Audi." *Id.* at 35.

The officers conducted a traffic stop of a black Audi as it was parked in front of 529 Seneca Street, which was identified at trial as the home of Appellee's girlfriend. N.T. 10/6/22, 36, 58, 78. The passenger of the car immediately exited the car. *Id.* at 36-37, 78. That person did not comply with Officer Rimmer's order to show his hands and walked away from the

- 4 -

officer. *Id.* at 37. Officer Rimmer saw that person throw a gun underneath a work truck and run around the residence of 529 Senaca Street. *Id.* at 37. Officer Banks saw the passenger throw two firearms while fleeing. *Id.* at 78. Officer Rimmer provided a description over his radio for that man as wearing a multicolored Looney Tunes jacket and the location where he threw the gun. *Id.* at 38. Officer Rimmer remained at that location monitoring Appellee, who was the driver of the Audi (and who was still in the car), and the gun underneath the truck. *Id.* at 38-40, 78. After walking around the back of the truck, Officer Rimmer saw the second gun "on the far view on the passenger side of the truck on the driveway." *Id.* at 42. The first gun, that was tossed underneath the truck, was a silver Taurus revolver. *Id.* at 42, 79. The second gun, on the driveway, was an operable, black and silver Smith & Wesson semiautomatic handgun that had a round in its chamber with four additional rounds in its magazine. *Id.* at 43-45, 54, 79; N.T. 10/7/22, 32. Officer Banks recovered the revolver and Officer Rimmer recovered the handgun.[4] N.T. 10/6/22, 44.

The passenger fled through some yards and was located by the police in the 500 block of Delaware Avenue. N.T. 10/6/22, 92. The passenger was then wearing a short-sleeved white t-shirt and pants. *Id.* at 92. Upon a search incident to his arrest, the police recovered three "piles" of money from his wallet in the amounts of $800, $500, and $231. *Id.* at 93. "[B]roken

---

[4] Appellee did not possess a permit to carry a concealed firearm. N.T. 10/7/22, 33.

chains with shiny stones, either that they were or meant to have the appearance of being diamond-crusted" were also recovered from his person. *Id.* at 93, 95-96. This jewelry was later confirmed at trial by Bartee as the chain and jewelry that was taken from him during the robbery. N.T. 10/5/22, 87-88. From the tree line that was in between the location of the traffic stop and where the passenger was taken into custody, the police recovered a black jacket covered in Looney Tunes characters. N.T. 10/6/22, 94. Diaz identified the passenger as Wimberly who was placed in custody at that scene. *Id.* at 173. Diaz then was brought to Appellee, and she positively identified him. *Id.* at 173-74.

Detective Kuntz subsequently conducted interviews of Bartee, Diaz, Appellee, Wimberly, and Batiz; Appellee signed a *Miranda*[5] rights waiver form.[6] N.T. 10/6/22, 207-10. A gunshot residue test was also performed on Appellee. *Id.* at 210; N.T. 10/7/22, 8. Upon executing a search warrant on the black Audi, the police recovered $1,018 from the center console and liquor bottles in a teal bag that had been purchased for $473 at a store in

_____

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] The Commonwealth addressed portions of Appellee's videotaped interview in its closing argument at trial. N.T. 10/7/22, 196-200. We note, however, that the Commonwealth has not ensured the presence of a copy of that interview in the record certified for this appeal.

Phillipsburg, New Jersey.[7]  N.T. 10/6/22, 194-95; N.T. 10/7/22, 13-18, 25. The police also recovered an iPhone from the car; they were unable to determine an owner for the phone but were able to determine that it was not Diaz's stolen phone.  N.T. 10/7/22, 26-27.  On Wimberly's Instagram account, the police found a photograph from March 12, 2020, that showed Wimberly wearing the recovered Looney Tunes jacket and Appellee wearing the same striped sweatshirt that he was wearing on surveillance videos on the day of the robbery.  *Id.* at 27-28.

Body worn camera footage from Officer Rimmer and Officer Banks, and mobile video footage from their patrol car that showed the positions of the discarded guns, was played at trial.  N.T. 10/6/22, 48-53, 81.  During the footage from Officer Banks' body worn camera, Appellee said, "Listen, Listen. Tell Joanne that the money is in there. You hear?  That the money is inside the car," in Spanish; the father or step-father of Appellee's girlfriend, Joanne Batiz, was present at the location at that time.  *Id.* at 39, 41-42, 84.

Upon later searching for a projectile in connection with the shooting, Bethlehem Police Officer Douglas Nothstein noticed a bullet hole in a window at 403 Cherokee Street and recovered a projectile from the top of an air conditioner from inside an apartment at that location.  N.T. 10/6/22, 8, 12, 16.  The officer identified it at trial as a "9 millimeter .38 round roughly."  *Id.*

---

[7] $280 of the recovered money was returned to Bartee by the police.  N.T. 10/7/22, 10-11.  The police also provided him gift cards totaling $1,812.34 for temporary lodging.  N.T. 10/7/22, 11, 97-98.

at 15. The police did not find any fired cartridge casing in connection with this case. N.T. 10/7/22, 47-48, 69.

Swab samples from the handgun and the revolver were tested and compared with buccal samples from Appellee and Wimberly. N.T. 10/4/22, 79-81, 83, 90-91, 121; N.T. 10/7/22, 31-32. Based on the comparison, the Commonwealth presented expert testimony showing that there was "no interpretable results" with respect to the revolver sample, and a DNA profile obtained from the handgun sample was consistent with a mixture of at least three individuals with Appellee contributing the most DNA to the profile. N.T. 10/4/22, 122-25; N.T. 10/7/22, 82-83. No characteristic gunshot residue particles were found to be present on Appellee's hands that "would lead someone to the belief that [he] definitely fired a firearm recently." N.T. 10/4/22, 139-40; N.T. 10/6/22, 211, 132-33. Only indicative particles, which "can be picked up from firearm to firearm" or "come from other elements in the environment," were found to be present. N.T. 10/6/22, 211; N.T. 10/7/22, 74, 76-77. Accordingly, it could not be determined that Appellee had recently fired a firearm. N.T. 10/6/22, 211; N.T. 10/7/22, 77-78.

On July 6-7, 2022, Appellee proceeded to be tried by a jury and was found not guilty of a severed charge for persons not to possess firearms.[8] N.T. 7/7/22, 163-64. On October 3-7, 2022, Appellee proceeded to another jury trial on the remaining charges and was found guilty of robbery (with respect

---

[8] 18 Pa.C.S. § 6105(a)(1).

to Todd Bartee), criminal conspiracy to commit robbery, theft by unlawful taking, theft by receiving stolen property, terroristic threats, recklessly endangering another person, carrying a firearm without a license, and simple assault.[9] Verdict Sheet, 10/7/22, 1-4.

Todd Bartee appeared, among others, as a witness for the Commonwealth at trial and testified consistent with the above-stated facts. Taisha Diaz did not appear. Her 9-1-1 call with respect to the robbery was played for the jury.[10] N.T. 10/6/22, 69-70, 73. The Commonwealth moved three surveillance videos into the record.[11] The first showed Bartee ducking. N.T. 10/5/22, 81-83. The second showed Appellee and Wimberly walking away from Bartee. N.T. 10/5/22, 82. The third showed Appellee and Wimberly walking away from Bartee on 4th Street after the robbery. *Id.* at 82. The Commonwealth also moved into the record the chain taken from Bartee and two pendants that been on it, and which had been recovered from Wimberly. *Id.* at 87-88; N.T. 10/6/22, 95.

_____

[9] 18 Pa.C.S. §§ 3701(a)(1)(ii), 903/3701(a)(1)(ii), 3921(a), 3925(a), 2706(a)(1), 2705, 6016(a)(1), and 2701(a)(1), respectively. The jury also found Appellee not guilty of criminal attempt to commit criminal homicide, aggravated assault, aggravated assault with a deadly weapon, and robbery (with respect to Taisha Diaz). 18 Pa.C.S. §§ 901(a)/2501(a), 2702(a)(1), 2702(a)(4), 3701(a)(1)(ii). Verdict Sheet, 10/7/22, 1-4.

[10] There is no transcript for the 9-1-1 call in the trial notes of testimony and the Commonwealth has not ensured the presence of a digital copy of the call in the record provided to this Court.

[11] The Commonwealth has not ensured the presence of copies of any of these surveillance videos in the certified record for this appeal.

The defense presented testimony from Kayla Ortiz. Ortiz testified that, on the afternoon at issue, her friend "Rosie" and Rosie's boyfriend had an argument in her home. N.T. 10/6/22, 122. She denied that anything that happened on that day escalated past "just a verbal argument," or that there was a shooting or a pistol whipping. *Id.* at 122-23.

The defense also presented testimony from Patrol Officer Emily Falko, who responded to a report of a damaged window at 403 Cherokee Street at 4:30 p.m., and then responded to a hit-and-run in the 500 block of Cherokee Street before being dispatched to the robbery report at 421 Wyandotte Street. N.T. 10/6/22, 139-144, 160. Officer Falko denied hearing any gunshots during that time and described the circumstances of her investigation into the broken window at 403 Cherokee Street, including that she was unable to locate any projectile that caused damage to the window. *Id.* at 141-50.

As part of the robbery investigation, Officer Falko transported Taisha Diaz to the location where Appellee and Wimberly in custody. N.T. 10/6/22, 152-54. She described Diaz as "looking like she was put together" and noting that her makeup was "unblemished and unremarkable." *Id.* at 155. She recalled Diaz saying that she made up and embellished saying that she had been running while she had made her 9-1-1 call. *Id.* at 156-57, 178-79. She also recalled Diaz telling her "that it was Todd who was shot at." *Id.* at 159.

Officer Falko testified about Diaz telling her that there was an altercation at the home of her friend, "K," during which she left the home and returned, and that her phone had been taken from her. N.T. 10/6/22, 163-65. Officer

Falko recalled the circumstances of Diaz's "show up" identifications of Appellee and Wimberly. *Id.* at 173-74. She also recalled that Diaz declined receiving medical care after the officer wanted to take her to the hospital "because she said she had gotten hit on the head by" Wimberly. *Id.* at 174. She noted that Diaz told her that she was shot at, and that she took Diaz around the area to identify the location of that shooting. *Id.* at 174-75. Diaz described a path that she and Bartee ran and explained that she heard a gunshot when they got to Dakota and Hoch Streets. *Id.* at 175. Diaz told Officer Falko that, during a "traumatic event" at "K's" house, Appellee and Wimberly had guns in their hands, and "K" stayed in her room during the robbery. *Id.* at 177.

On January 4, 2023, the trial court sentenced Appellee to an aggregate and mandatory minimum term of ten to twenty years' imprisonment. N.T. 1/4/23, 37-39. At the start of the sentencing hearing, defense counsel informed the court of his receipt of an affidavit from Taisha Diaz that he had received from another attorney on the Friday before and which he had shared with the Commonwealth. *Id.* at 2. Counsel proffered that the affidavit, *inter alia*, reflected that there was no incident, that "the 911 call was made up," and that Bartee had coached her to lie on the 9-1-1 call. *Id.* at 3. The Commonwealth proffered that Diaz did not communicate the allegations in the affidavit when they spoke to her shortly before trial. *Id.* at 4. The Commonwealth noted that Diaz was expected to contact them on the Thursday or Friday before the trial, that she never did, and that she refused all their calls after initially saying that she was going to come in and testify at

- 11 -

trial. *Id.* at 4. The court recommended to Appellee that he should subsequently file a motion concerning the affidavit. *Id.* at 9, 13.

Appellee timely filed a post-sentence motion, challenging the weight of the evidence, asserting an after-discovered evidence claim, and raising constitutional claims.[12] Post-Sentence Motion, 1/17/23, ¶¶ 16-49. In the after-discovered evidence claim addressing the affidavit discussed at sentencing, Appellee asserted that Taisha Diaz contacted his counsel "via letter" and provided a signed statement in which she, *inter alia*, recanted the content of her 911 call that was played at trial. *Id.* at ¶¶ 33-36. The signed statement, appended as Exhibit A to the post-sentence motion, alleged the following:

> I, Taisha Diaz, am recanting my original statement because it was a false accusation on my behalf. I was in a relationship with Todd Bartee and he forced me to call 911. He instructed me what to say and I did because I was fearful for my life with Todd. I do not know [Appellee] or had any altercations of any sort with him. I can't even recall my original statement because those weren't my words nor was any of it true. I was forced to say those things. I was also offered and asked by police or whoever was handling the case if I needed any money, rides, or places to stay to make sure

---

[12] The tenth day after the January 17, 2023 sentencing hearing was Saturday, January 14, 2023. The deadline for Appellee to file a timely post-sentence motion was extended by rule until Tuesday, January 17, 2023, the first business day after our observed holiday in honor of Dr. Martin Luther King, Jr. *See* 1 Pa.C.S. § 1908 (when the last day for a statutory filing deadline falls on a weekend or holiday, the deadline shall be extended until the next business day); Pa.R.A.P. 107 (incorporating 1 Pa.C.S. § 1908 with respect to deadlines set forth in the Rules of Appellate Procedure); Pa.R.Crim.P. 720(A)(1) (except as provided in subsections involving after-discovered evidence claims and summary case appeals, "a written post-sentence motion shall be filed no later than 10 days after imposition of sentence").

> I would come testify. I am writing this because [Appellee] nor anyone did anything that was said in that 911 call. It was all a false accusation and that's the truth and I need to speak on it. I do not want a[n] innocent man being charged or in jail, which is why I didn't go to court to testify my testimony because it wasn't truthful whatsoever even though I was threatened with a subpoena. I feel responsible and it's been on my conscious [sic] to come forth to make things right and tell the truth.

Post-Sentence Motion, 1/17/23, attached Exhibit A, Diaz Statement, undated.

On March 2-3, 2023, the trial court presided over an evidentiary hearing on the after-discovered evidence claim. Diaz testified that she never encountered Appellee on March 29, 2020, and that Bartee "made [her] call 911 and state that he had been robbed and [they] had gotten shot at." N.T. 3/2/23, 28. She asserted that "nothing physical happened," Appellee never robbed or assaulted Bartee, and Appellee never took anything from Bartee. *Id.* at 29, 31. She explained, "I was currently going through domestic abuse, so if [Bartee] said 911, I would call it." *Id.* She noted that he told her everything to say on the 9-1-1 call. *Id.* She also explained that she did not want to be a trial witness because of this: "So I didn't want to come to court, because I already lied in the first place. And I don't want to stand trial on the stand -- obviously on the stand, to like, lie." *Id.* at 30.

On cross examination, Diaz documented phone calls – pre-trial and post-sentencing – during which Detective Kuntz attempted to schedule trial preparation with her and speak with her about her post-trial affidavit. N.T. 3/2/23, 33-44. In the lone call that she did not let go to her voicemail, she told Detective Kuntz on September 29, 2022, that she "would let him know"

- 13 -

about her being a witness and that she "did not want to go to court or stand on trial." *Id.* at 41-43.

Diaz explained that she met the attorney who accompanied her to the notarization of her affidavit through a mutual friend of Appellee's girlfriend. N.T. 3/2/23, 44-47. She testified that she did not contact the District Attorney's Office or Detective Kuntz "[b]ecause she needed a lawyer beforehand." *Id.* at 47. She asserted, "I didn't come to court, because I was originally scared to, but I didn't want someone to go to jail for so many years because of my lie." *Id.* at 48. As for the supposed theft of her cellular phone, she noted that Bartee threw it and broke it. *Id.* at 48, 60. She maintained that she did not remember what she said in the 9-1-1 call because she "was just saying whatever [Bartee] wanted [her] to say." *Id.* at 49. She claimed that she did not remember her "show up" identifications of Appellee and Wimberly. *Id.* at 55, 60.

Diaz acknowledged that she gave a written statement to Officer Falko outside the presence of Bartee. N.T. 3/2/23, 74. The contents of that statement were as follows:

> Sunday around 5:30-ish, me and my boyfriend was at my friend K house. When we arrived, we'd seen my boyfriend, friend Q. I didn't know he was going to be there. None of us did.
>
> We were hanging out. Then a convo came up about buying a bottle from Phillipsburg. Then Q left. We started doing a vlog on my phone.
>
> Next thing I know, Justin is pointing a 9 millimeter or a .40 at Todd, and Q had a .38 revolver. They snatched his necklaces,

took his money and wallet with all his stuff in it after hit him with the gun.

Q took my phone and asked if I had jewelry as well, but I didn't. I seen K throwing my bags out to the hallway, so I took it downstairs running to the laundry mat to make sure they don't take that too.

They were yelling, quote, give me ya money, pussy. End quote. Quote, you a bitch. End quote, while taking his stuff.

Before I went downstairs, Justin smacked me with a piece of the gun on the back of my head. It says, I can [sic] back upstairs to see what was happening, but they locked the door.

My friend's mom was yelling, open the door, they violating my daughter's house. I stayed in the laundry mat for a while because I didn't have a phone to call anyone.

Me and Todd end up walking away after a while of sitting at the laundry mat to find a place to go. But we end up seeing them in the black Audi. I had already been on the phone with the operator at this point, so me and Todd ran to St. Luke's because it was closest.

We then identified who did this to us. While waiting to see where to go, K threw down our jackets and the purse she put away for me.

*Id.* at 75-77. When confronted with parts of the statement, Diaz asserted that she was intoxicated that day and so she did not remember "a lot of calmstuff [she] said." *Id.* at 62-63. As to her ability to remember the information that Bartee supposedly told her, Diaz testified, "Because I know if I don't listen to him, there are repercussions that come with that." *Id.* at 63.

After reviewing the contents of Diaz's written statement to Officer Falko, the Commonwealth played a videotape of her interview with Detective Kuntz.

N.T. 3/2/23, 77-81. She acknowledged that she said that she got hit in the head and that paramedics looked at her head at that time. *Id.* at 81. She agreed that she talked about a settlement check in the video, which Bartee had received and that Appellee "knew about," but testified that "the check was gone already." *Id.* at 82.

Following court-ordered briefing from the parties, the court vacated the convictions and judgments of sentence and granted Appellee a new trial. Order, 4/28/23, 1; Order 5/1/23, 1. The trial court advises us that it found that Diaz's testimony "reached a level of credibility sufficient to allow [Appellee] and the Commonwealth to challenge any discrepancy between Mr. Bartee and Ms. Diaz in a new trial." Opinion, Murray, J., 4/28/23, 5. The court based this credibility finding on the consistency between Diaz's affidavit and her hearing testimony, that the fact that the court could hear Diaz "parroted" at least one word said by Bartee during the 9-1-1 call, and Diaz's demeanor during the 9-1-1 and her police interview (in the court's assessment, she was "unusually calm" during those interactions and her significant pauses during the 9-1-1 call suggested that her answers were coached). *Id.* at 4-5. The court determined that Diaz's testimony could not be obtained prior to trial where she admitted at the evidentiary hearing that she came forward only after learning that [Appellee] was sentenced to ten years because she "didn't want someone to go [to] jail for so many years

because of [her] lie."[13] *Id.*, *citing* N.T. 3/2/23, 29. The court also reasoned that the post-trial testimony from Diaz was not corroborative or cumulative of the trial evidence. Opinion, Murray, J., 4/28/23, 5. Lastly, the court concluded that Diaz's testimony would likely result in a different verdict, "particularly in light of Ms. Ortiz's testimony and the arguable discrepancies in Mr. Bartee's testimony." *Id.* at 6.

The Commonwealth timely filed a notice of appeal and a court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Notice of Appeal, 5/1/23, 1; Rule 1925(a) Order, 5/2/23, Rule 1925(b) Statement, 5/17/23, 1-2.

The Commonwealth presents the following questions for our review:

I. Did the trial court err and/or abuse its discretion by determining that the allegedly exculpatory evidence could not have been obtained before the conclusion of trial by reasonable diligence?

II. Did the trial court err and/or abuse its discretion by determining that Taisha Diaz's recantation testimony is of such a nature and character that a different outcome is likely?

Appellant's Brief at 4 (original all in caps; suggested answers omitted).

In the first issue presented, the Commonwealth asserts that the trial court erred or abused its discretion by concluding that the recantation

---

[13] We note for the sake of clarity that defense counsel first addressed Diaz's recantation at the start of Appellee's sentencing hearing prior to the imposition of any term of imprisonment. N.T. 1/4/23, 2-4.

evidence from Diaz could not have been obtained before the conclusion of trial with the exercise of reasonable diligence by the defense. Appellant's Brief at 14-21. It maintains that this evidence was not "newly discovered evidence" because Appellee maintained throughout trial that Diaz had fabricated the contents of her 9-1-1 call. *Id.* at 14, 17-18. Even if this evidence qualified as newly discovered evidence, the Commonwealth alleges that Appellee could not have received relief based on it because he failed to demonstrate any attempts to investigate the recantation before or during trial by, among other things, conducting an interview with Diaz and serving her with a subpoena to appear at trial. *Id.* at 14, 18-21. In short, the Commonwealth argues that it was improper for the court to relieve Appellee of his burden of proving his diligence in securing in the evidence and, instead, merely rely on the fact that Diaz did not come forward with her recantation until after trial as a substitute for the diligence showing requirement. *Id.* at 16.

Appellee responds that "he could not have discovered that Taishia Diaz would recant the statements she made in her 911 call and to the police prior to trial." Appellee's Brief at 14. He asserts that was "particularly true insofar as the Commonwealth had Ms. Diaz on its witness list until the last day of trial, and never indicated to [him] that Ms. Diaz was not cooperating with it." *Id.* He also points to Diaz's post-trial hearing testimony as proof that she only decided to come forward with her recantation after sentencing. *Id.* Because Diaz "was an apparent cooperating witness," Appellee asserts that he "had no

reason to believe that she was recanting her testimony until she came forward after his sentencing." *Id.* at 14-15.

"When we examine the decision of a trial court to grant a new trial on the basis of after-discovered evidence, we ask only if the court committed an abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Padillas*, 997 A.2d 356, 361 (Pa. Super. 2010) (citation omitted). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* (citation omitted). Where the evidentiary ruling turns on a question of law, our standard of review is plenary. *Commonwealth v. Woeber*, 174 A.3d 1096, 1100 (Pa. Super. 2017). As a recantation is the sole basis for the relief granted at issue, we note that our Supreme Court has treated recanting testimony as "exceedingly unreliable" and has stated that "[t]here is no less reliable form of proof, especially when it involves an admission of perjury." *Commonwealth v. Coleman*, 264 A.2d 649, 651 (Pa. 1970) (citations omitted).

With respect to our scope of review, the Pennsylvania Supreme Court has provided:

> The scope of review of a decision to grant a new trial is dictated by whether the trial court has set forth specific reasons for its decisions or leaves open the possibility that reasons in addition to those stated support the award of a new trial. Where the trial court leaves open the possibility that reasons exist to support is

decision in addition to those actually stated, an appellate court will undertake a broad review of the entire record. However, where the trial court indicates that the reasons stated are the only basis for which it ordered a new trial, an appellate court must confine the scope of its review to the stated reasons. This is not to say that the reviewing court looks only to the stated reasons in a vacuum. It is the obligation of the reviewing court to look at the entire record to determine if the trial court's stated reasons are supported therein.

*Commonwealth v. Widmer*, 744 A.2d 745, 750 (Pa. 2000) (citations omitted).

Relief is due on an after-discovered evidence claim when the proponent can "demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted." *Commonwealth v. Crumbley*, 270 A.3d 1171, 1178 (Pa. Super. 2022) (citation omitted). Failure to satisfy any one prong of this standard by a preponderance of the evidence is fatal to the claim. *See Commonwealth v. Solano*, 129 A.3d 1156, 1180 (Pa. 2015) ("As this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones."); *Padillas*, 997 A.2d at 363 ("[T]he defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.").

This first issue focuses on whether Appellee demonstrated that the new information from Diaz could not have been discovered prior to or during trial

through the exercise of reasonable diligence. Appellee could not prevail on the initial prong of the after-discovered evidence test by just saying that he was unaware of a recantation from Diaz until after the trial. *Padillas*, 997 A.2d at 364 ("A defendant cannot claim he has discovered new evidence simply because he had not been expressly told of that evidence."). The question of whether he conducted the requisite due diligence as to the first prong instead hinges upon whether Diaz was an "obvious, available source of information" and whether reaching out to her for investigation would have been reasonable under the circumstances. *Id.* ("[A] defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence.").

Here, we cannot glean any error or abuse of discretion with respect to the trial court's finding that the due diligence requirement was satisfied where the court concluded that Diaz's testimony could not have been obtained prior to trial. Trial Court Opinion, 4/28/23, 5. While Appellee argued at trial that the content of Diaz's statements on the 9-1-1 call were likely to be fabricated based on their content, the record does not reflect that Appellee had any reasonable basis to actually expect that Diaz would be a source of information helpful to the defense prior to or during the trial. Diaz remained identified as a Commonwealth witness at the time of trial and, by her own testimony at the post-sentence motion hearing, she expressed multiple times that she did not want to appear at trial and plainly stated that she was only willing to come

forward to supposedly correct her prior statements following the trial verdict. *See* N.T. 3/2/23, 30 ("So I didn't want to come to court, because I already lied in the first place. And I don't want to stand trial on the stand -- obviously on the stand, to like, lie."), 48 ("I didn't come to court, because I was originally scared to, but I didn't want someone to go to jail for so many years because of my lie.").

The conclusion that Diaz's recantation was unavailable to Appellee, regardless of an absence of investigative efforts, is further supported in this instance by the fact that the Commonwealth's own contacts with Diaz prior to trial were limited to a single phone with Detective Kuntz in which Diaz merely informed the detective that she "would let him know" about her being a witness and that she "did not want to go to court or stand on trial." N.T. 3/2/23, 41-43; *see also* N.T. 10/3/22, 7 (Commonwealth addressing at a pre-trial hearing Diaz's prospects for testifying: "She responded that she would come to court, even though she hadn't received the subpoena because it had been sent somewhere else. She said she could come to court. And then we had not heard from her. We tried to make contact with her but had not heard from her."). In these circumstances, it does not appear that any efforts by Appellee to investigate Diaz would have yielded any information for him, let alone information helpful for supporting a defense, especially where the Commonwealth itself could not compel her cooperation to appear at trial. Because it would not have been reasonable for the defense to reach out to Diaz in light of these facts, Appellee had a plausible explanation for his failure

to earlier discover possible recantation evidence from Diaz. Accordingly, we are unable to conclude that that the trial court misapplied law or abused its discretion for not finding a lack of due diligence on Appellee's part.

In the second issue presented, the Commonwealth argues that the trial court erred or abused its discretion by determining that Diaz's recantation testimony was likely to change the outcome of the trial. Appellant's Brief at 22-33. It asserts that the trial evidence corroborated Diaz's 9-1-1 call and the trial court ignored the entirety of the Commonwealth's trial evidence in reaching its discretion to grant a new trial. *Id.* at 22-25, 27. Among other things, the Commonwealth points out that Appellee and Wimberly were found near Bartee and Diaz, Diaz provided an accurate description of the clothing of Appellee and Wimberly even though the version of events in her recantation provided that she and Bartee had never seen the men on the date in question, and Diaz's recantation was contradicted by Appellee's police interview that admitted to an encounter between Appellee and Bartee on the day in question. *Id.* at 23-24, 28. The Commonwealth also argues that the content of Diaz's 9-1-1 call and her police interview contradict the trial court's assessment of her demeanor. *Id.* at 26-27. The Commonwealth maintains that, by granting a new trial, the trial court misapplied our law on after-discovered evidence and "arrived at a manifestly unreasonable conclusion to give effect to its own will." *Id.* at 32.

Appellee maintains that, based on discrepancies pointed out by his cross-examination of Bartee, if Diaz had testified at trial and contradicted the

testimony of Bartee, it is likely that the jury would not have convicted him. Appellee's Brief at 16. Accordingly, he asserts that this Court should not overturn the grant of a new trial based on a cold record. *Id.*

The trial court ruled in Appellee's favor of the fourth prong of the after-discovered evidence because it believed that the inclusion of Diaz's post-trial testimony at trial would have likely changed the jury's verdict:

> Ms. Diaz's testimony would also likely result in a different verdict, particularly in light of Ms. Ortiz's testimony and the arguable discrepancies in Mr. Bartee's testimony. There are only two victims in this case. The jury heard the testimony of Mr. Bartee and Ms. Diaz's 911 call. Ms. Diaz did not testify, and now recants both her 911 call and her statement to the police. In view of the seriousness of the charges against [Appellee], the two dueling victim witnesses, and Ms. Diaz's assertion that they were not robbed, justice requires a new trial. In short, under these circumstances, [Appellee] has the right to have a jury hear the testimony of *both* Mr. Bartee and Ms. Diaz.

Trial Court Opinion, 4/28/23, 6 (emphasis in original).

The trial court's opinion reflects that its determination in those respects was guided in large part by its comparison of Diaz's post-trial testimony to the demeanor and the content of the audio recording of her 9-1-1 call and the video recording of her police statement:

> Moreover, Ms. Diaz's testimony was consistent with the affidavits she provided to defense counsel following [Appellee's] conviction, as well as the testimony of Ms. Ortiz during trial. A fair hearing of the 911 call also corroborates Ms. Diaz's testimony. Ms. Diaz testified: "when I was on the 911, he told me everything I should say. So I was just saying everything that he was." For instance, a male voice, Mr. Bartee, answered "alley" to a question posed by the 911 operator, and Ms. Diaz parroted "alley" on the call. Additionally, there were significant pauses between the operator's

questions and Ms. Diaz's answers, further suggesting her answers were coached, as she alleged.

The court also took notice of Ms. Diaz's demeanor both on the 911 call and on the video of her interview at the police station. Ms. Diaz's tone of voice on the call was unusually calm for someone who claimed she had been robbed. Her demeanor during her statement to the police was likewise inconsistent with someone who had purportedly been robbed at gunpoint. Similar to the 911 call, she seemed remarkably calm. While Mr. Bartee testified that Ms. Diaz "was getting beat" by Q with a pistol, Ms. Diaz appeared unharmed in the video, taken the same day the incident occurred.

As such, upon consideration of Ms. Diaz's affidavit, her testimony, the 911 call, and video of her statement to police, as well as the testimony of Ms. Ortiz during trial, we find Ms. Diaz's testimony reached a level of credibility sufficient to allow [Appellee] and the Commonwealth to challenge any discrepancy between the testimony of Mr. Bartee and Ms. Diaz in a new trial.

Trial Court Opinion, 4/28/23, 4-5 (record citations omitted).

The Commonwealth challenges the trial court's interpretations of the audio and video recordings while framing the recantation account as incredible in light of its own trial evidence, *see* Appellant's Brief at 26-27, but we are unable to materially assess this argument because the Commonwealth never ensured the presence of digital copies of the audio and video recordings in the record certified for this appeal. As a result, for purposes of the abuse of discretion standard, it is impossible for us to conclude whether the trial court reached manifestly unreasonably conclusions as to that evidence.

Even if the audio and video recordings were made available to this panel, we would be inclined to defer to the trial court's evaluation of the evidence as it was present for all the testimony taken below and "[o]ur task is not to

engage in a *de novo* evaluation of testimony." ***Commonwealth v. Cobbs***, 759 A.2d 932, 934 (Pa. Super. 2000) (addressing a substantive after-discovered evidence claim on PCRA review). For the most part, the dispute over the nature of the evidence raised by the Commonwealth deals with the trial court's determinations on the subjective character of Diaz's voice and appearance in the audio and video recording that are not presently before us. To extent that the Commonwealth is suggesting that we should supplant our own judgment for the trial court in those respects, we must extend great deference to the trial court's finding that the recordings warrant a new trial upon consideration of the post-trial testimony of Diaz.

The Commonwealth presents many persuasive points in its argument that may very well prevail in securing new guilty verdicts with a jury at a second trial, but the analysis offered in support of this claim does not demonstrate an error of law or an abuse of discretion for our purposes. The Commonwealth also notes our well-established caselaw providing that recantation testimony is "extremely unreliable." Appellant's Brief, 22, ***citing Commonwealth v. Henry***, 706 A.2d 313, 321 (Pa. 1997); ***Commonwealth v. Nelson***, 398 A.2d 636, 637 (Pa. 1979). While recantation testimony is rejected as unpersuasive in many instances where it is the focus of after-discovered evidence claims, we are unable to find that the trial court should have categorically rejected Diaz's post-trial testimony as unreliable where the trial jury had never heard any testimony from Diaz in the first instance and thus the testimony did not admit a past instance of perjury.

We affirm the trial court's award of a new trial based on Diaz's post-trial testimony.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/21/2024